UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


RUSS IVY,                                    CASE NO.

      Plaintiff,                         2:20-cv-01475-

V.                                           ILRL-KWR

JADE TRAN; XL REI, LLC;

DOES 1-10

      Defendants




      30(b)(6) DEPOSITION OF XL REI, LLC, through its designated representative, JADE TRAN, given in the above-entitled cause, via Zoom videoconferencing, pursuant to the following stipulation, before Sandra P. DiFebbo, Certified Shorthand Reporter, in and for the State of Louisiana, on the 18th day of June, 2021, commencing at 10:00 AM.

```
 1                    Okay.  I believe so.
 2    BY MS. PHELPS:
 3         Q.   Did you text Russ Ivy on any other
 4    occasions after that about evicting him?
 5         A.   Yes.
 6         Q.   Do you recall the dates that you texted
 7    him?
 8         A.   I don't recall the exact date. It was
 9    multiple times.
10         Q.   What did those text messages say?
11         A.   That he was being evicted.
12         Q.   For what reason?
13         A.   For nonpayment with rent.
14         Q.   What was Russ Ivy's response to those
15    text messages?
16         A.   I don't recall his response.  I think he
17    was using some excuse or something as to why he was
18    late.
19         Q.   I'm going to show you a document.  Do you
20    see the document I have pulled up?
21         A.   Yes.
22         Q.   What is this document?
23         A.   It's an eviction notice.
24              MR. MOST:
25                   We designate this as Exhibit C.
```

1     A.    Yes.

2     Q.    What conversations did you have with them

3  before sending the April 9th notice?

4     A.    That I sent Russ Ivy a notice on March

5  25th.

6     Q.    What did the law enforcement officer say

7  to you?

8     A.    He said that Russ Ivy is a real nuisance

9  in the community.  He said that he arrested Russ

10  Ivy earlier in the year for domestic child abuse or

11  violence, and he said that Russ Ivy was a piece of

12  work.

13     Q.    What did he tell you about the ability to

14  evict Russ Ivy?

15     A.    He said that he was going to go over and

16  evict Russ Ivy himself.

17     Q.    At that time, you had not been to court

18  yet regarding the eviction?

19     A.    Yes.

20     Q.    You called the police to evict Russ Ivy

21  before you had been to court to have the eviction

22  completed?

23          MR. ONSTOTT:

24               Object to form.  You can answer,

25            Jade.

1          Q.    That would be the address you gave us

2    earlier?

3          A.    Yes.

4          Q.    Did you speak to anyone during the break?

5          A.    My attorney.

6          Q.    What did y'all discuss?

7                MR. ONSTOTT:

8                     Object to privilege.  The general

9                 content was the deposition procedure

10                and whether or not the private

11                information that was asked about at the

12                beginning of the conversation would be

13                redacted from the record, specifically,

14                her Social Security number.

15   BY MS. PHELPS:

16         Q.    To pick back up.  I'm going to show you a

17   document I left out earlier.  Do you recognize this

18   document?

19         A.    Yes.  It looks a little different.  It

20   doesn't have the logo on it.

21         Q.    What is this document?

22         A.    It's a lease agreement.

23         Q.    Who is the lease agreement between?

24         A.    Russ Ivy and XL REI.

25         Q.    Who signed on behalf of XL REI?

1       A.   I did.

2       Q.   What is the date of the agreement?

3       A.   August 1st, 2018.

4       Q.   What property is the lease on?

5       A.   56341 Dock Marinoff Road in Bogalusa.

6       MR. MOST:

7              This is William Most.  I want to

8           note that is Exhibit D.

9 BY MS. PHELPS:

10      Q.   Where we left off before the break, you

11 mentioned that you called the police, and they went

12 out to that property, correct?

13      A.   Yes.

14      Q.   I'm going to show you a video.  This is a

15 video taken by Russ Ivy at the property.  I'm going

16 to play the video.

17      MS. PHELPS:

18             Let me know if the sound plays for

19          everyone.

20             {VIDEO PLAYED}

21      MS. PHELPS:

22             We'll attach that to the deposition

23          as Exhibit E.

24 BY MS. PHELPS:

25      Q.   Did you see the FedEx box in the video?

48

1       Q.   Do you recall the locksmith's name, the

2  person who went out?

3       A.   I believe it was Charles.

4       Q.   Had you ever contacted Charles to change

5  locks at properties prior to this?

6       A.   No.

7       Q.   What date did you first contact Charles

8  to request that he change the locks on the property

9  where Russ Ivy was a tenant?

10      A.   I believe April 5th or April 6th.

11      Q.   April 5th or April 6th was before the

12  video that we just showed.  So you contacted

13  Charles to change the locks on the property while

14  Russ Ivy was still occupying the property as a

15  tenant, correct?

16      A.   That's not correct.

17      Q.   What is not correct about that?

18      A.   I contacted the locksmith when I believed

19  the property was empty and abandoned and Russ Ivy

20  had abandoned the property.

21      Q.   What happened when Charles went out to

22  change the locks?

23      A.   He said that there was someone there

24  claiming to be the tenant.

25      Q.   Do you have any reason to believe that

1    the person there claiming to be the tenant was not

2    Russ Ivy?

3           A.    Yes.   I thought that it might be a

4    squatter, because I had not heard from Russ Ivy.

5    And even after the locksmith came, I did not hear

6    from Russ Ivy, so I did not believe that it was

7    Russ Ivy.   So I contacted the police to say that

8    there was a potential squatter in the house.

9           Q.    You testified earlier that Russ Ivy had

10   responded to your text messages when you notified

11   him of the eviction.   Specifically, you said he was

12   making excuses.   Is that correct?

13          A.    Yes.

14          Q.    Why would you have any reason to believe

15   that Russ Ivy had vacated the property?

16          A.    Because I didn't hear from him after

17   March 16th, and he was three months behind in rent.

18   So after making the excuses, he just stopped

19   responding.   That's usually indicative that the

20   tenant has just left.   That led me to believe he

21   just left the property.

22          Q.    I'm going to show you a picture.   Do you

23   recognize the property in this picture?

24          A.    I don't recognize what angle that's from.

25          Q.    Is this a picture of the Dock Marinoff

1  property?

2      A.   I've only been there once, so I can't say

3  for sure.

4      Q.   This is a picture that Russ Ivy took of

5  the locksmith.  Do you recognize the man in this

6  picture as Charles the locksmith?

7      A.   I do not.

8      Q.   Is that because you have never seen

9  Charles in person?

10     A.   Correct.

11     Q.   We'll attach this as Exhibit F.  You

12  testified that you contacted the police to go see

13  if there was a squatter on the property; however,

14  the video we showed just before this shows Russ Ivy

15  speaking and you saying you want to evict him.  So

16  you were aware at the time that the property was

17  not abandoned?

18          MR. ONSTOTT:

19              Object to form.

20          THE WITNESS:

21              Answer?

22          MR. ONSTOTT:

23              Yeah.  You can answer.

24          THE WITNESS:

25              That's not correct.  I was not aware

1              You'd have to ask them.  I don't

2          know, but that's what they said to me.

3    BY MS. PHELPS:

4      Q.   Is this in the same phone call where they

5    told you that they did not have the ability to

6    evict Russ Ivy?

7      A.   I think so.  Possibly the same phone

8    call.

9      Q.   So it was your intent to go down to

10   Louisiana with a bodyguard to evict Russ Ivy?

11     A.   No.  It was my intention to move into the

12   property.  I was hoping Russ Ivy would vacate on

13   his own, but Tim was there to protect me in case I

14   had any issues.

15     Q.   You were just trying to encourage Russ

16   Ivy to vacate the property?

17     A.   I thought at any point he would have just

18   vacated on his own, since he was already three

19   months behind.  He was not -- there was no signs

20   that he even called back, so I thought he would

21   just vacate on his own eventually.

22     Q.   You thought you needed to go down there

23   to encourage him to vacate?

24     A.   No.  I didn't want to go down there.  I

25   was told by the police to come down to take care of

1    it myself.

2        Q.   You testified that Tim Spelt was

3    accompanying you as a bodyguard in case you needed

4    protection.  I'm going to show you a video.

5                    {VIDEO PLAYED}

6    BY MS. PHELPS:

7        Q.   Do you recognize the man in that video to

8    be Tim Spelt?

9        A.   Yes.

10            MR. MOST:

11                We will make that Exhibit H.

12   BY MS. PHELPS:

13       Q.   Did you send Tim Spelt out to the

14   property that day?

15       A.   Yes.  Tim and I were going to meet up

16   that day, yes.

17       Q.   Did you send Tim Spelt out to the

18   property to lure Russ Ivy away from the property?

19       A.   No.

20       Q.   Why was Tim Spelt on the property asking

21   Russ for directions?

22       A.   I'm not sure.  He said in the video he

23   was lost.  Probably trying to find the address.

24       Q.   What address?

25       A.   He said he was lost, trying to find an

1           just a brief break to get water,

2           bathroom, stuff like that, since we've

3           been going for about an hour since the

4           last one.

5       MS. PHELPS:

6           Okay.  We'll take a break now.

7       MR. ONSTOTT:

8           I'm fine with that.

9           {BRIEF RECESS, 11:57-12:10}

10  BY MS. PHELPS:

11      Q.   Was it part of your job responsibilities

12  with XL REI to evict Russ Ivy?

13      A.   Yes.

14      Q.   Was it part of your job responsibilities

15  with XL REI to go to the property in person?

16      A.   Yes.

17      Q.   Did you provide Russ Ivy with advanced

18  notice that you and Tim Spelt would be present at

19  the property?

20      A.   I'm not sure.  I think Grezelle would

21  remember that communication.

22      Q.   Did you provide Russ Ivy with advanced

23  notice that you were sending the locksmith, the

24  cleaning person, or law enforcement officers to the

25  property?

76

```
 1            MR. ONSTOTT:
 2                 Object to form.
 3            THE WITNESS:
 4                 No, because we didn't think he was
 5            there.  He wasn't responsive to prior
 6            attempts.
 7    BY MS. PHELPS:
 8        Q.   After you sent the law enforcement to the
 9    property, you were aware that Russ Ivy was on the
10    property?
11            MR. ONSTOTT:
12                 Object to form.  You can answer.
13            THE WITNESS:
14                 When the police officer informed me
15            so, yes.
16    BY MS. PHELPS:
17        Q.   So at the time that you and Tim Spelt
18    traveled to Louisiana, you were aware that Russ Ivy
19    was on the property, correct?
20        A.   Yes.
21            MR. ONSTOTT:
22                 Object to form.
23    BY MS. PHELPS:
24        Q.   Why did you feel you needed to hire Tim
25    Spelt as a bodyguard if you thought that Russ Ivy
```

1    would leave the property voluntarily?

2         A.   Because I did not know what I was walking

3    into.  I didn't know Louisiana.  I'm not familiar

4    with Bogalusa.

5         Q.   You mentioned earlier when I showed you a

6    picture that you had only been on the property on

7    one occasion.  Is that correct?

8         A.   Yes.

9         Q.   Is the one occasion that you were on the

10   property the day that you went there with Tim Spelt

11   to see if you could get Russ Ivy to leave

12   voluntarily?

13        A.   No. It was the day that -- the only day I

14   came there was to clean and fumigate the property.

15        Q.   Is it your testimony that you never went

16   to the property while Russ Ivy was inside of it?

17             MR. ONSTOTT:

18                  Object to form.  You can answer.

19             THE WITNESS:

20                  I don't understand your question.

21   BY MS. PHELPS:

22        Q.   Did you go to the property while Russ Ivy

23   was inside it?

24        A.   I did not know if he was going to be

25   there or not there.

```
 1              not -- I didn't go up to the house.
 2   BY MS. PHELPS:
 3        Q.    I'm going to show you some pictures.
 4   What is this a picture of?
 5        A.    A broom.
 6        Q.    Do you recognize this broom?
 7        A.    Not exactly.
 8        Q.    Is the broom broken?
 9        A.    It does look like that.
10        Q.    Did you pick up this broom when you went
11   to the property?
12        A.    I don't recall which broom I picked up.
13   I thought it was white.
14        Q.    So you did pick up a broom when you went
15   on the property?
16        A.    Yes, in defense, because Russ Ivy
17   appeared out of nowhere and surprised me.
18        Q.    By nowhere, do you mean from the
19   property?
20              MR. ONSTOTT:
21                   Object to form.  Sorry.  If I
22              stepped on the question, I apologize.
23   BY MS. PHELPS:
24        Q.    By nowhere, you mean Russ Ivy appeared
25   from out of the property that he had a lease
```

1    agreement with you for?
2           MR. ONSTOTT:
3                Object to form.  You can answer.
4           THE WITNESS:
5                No.
6    BY MS. PHELPS:
7       Q.   Where did Russ Ivy appear from?
8       A.   I don't know.  It was out of nowhere.
9           THE COURT REPORTER:
10               You don't know.  It was what?
11          THE WITNESS:
12               It was out of nowhere.  I don't know
13            where he came from.
14   BY MS. PHELPS:
15      Q.   So he came from somewhere while you were
16   on the property that he was leasing from you,
17   correct?
18      A.   No.  It's my understanding he was not
19   under a lease agreement with anyone.
20      Q.   You did not have the court order evicting
21   him, though, correct?
22          MR. ONSTOTT:
23               Objection to form.  You can answer.
24          THE WITNESS:
25               I don't believe so.

```
 1            MR. ONSTOTT:
 2                  Object to form.  You can answer.
 3            THE WITNESS:
 4                  That's not correct.  He wasn't under
 5               a lease agreement anymore.  That was my
 6               understanding.
 7     BY MS. PHELPS:
 8        Q.    Did Russ Ivy come out from inside of the
 9     house?
10        A.    I don't recall where he came from.
11        Q.    You don't recall whether you broke a
12     broom from hitting Russ Ivy?
13        A.    Correct.
14        Q.    You do recall picking up the satellite
15     dish, correct?
16        A.    I vaguely remember that.
17        Q.    Did you throw the satellite dish at a
18     window on the property?
19        A.    I believe I did.
20        Q.    I'm sorry.  You believe you did or
21     didn't?
22        A.    I believe I did.
23            THE COURT REPORTER:
24                  Say it again.  It sounded different
25               to me both times. Did or did not?
```

1        THE WITNESS:

2            I believe I did.

3  BY MS. PHELPS:

4      Q.   When you threw the satellite dish at the

5  window, did it cause the window to shatter?

6        MR. ONSTOTT:

7            Object to form.  You can answer.

8        THE WITNESS:

9            I don't recall.

10 BY MS. PHELPS:

11     Q.   Why did you throw the satellite dish at

12 the window?

13        MR. ONSTOTT:

14            Object to form.  You can answer.

15        THE WITNESS:

16            I later learned it's because I was

17          having mental manic episode, so I don't

18          recall everything that happened,

19          because I was having a manic episode.

20 BY MS. PHELPS:

21     Q.   I am going to attach this picture as

22 Exhibit J. Do you recall causing damage to the

23 exterior of the house?

24     A.   I do not.

25     Q.   I'm going to show you some more pictures.

 1    the eviction of Russ Ivy.  Are you prepared to

 2    testify today about this topic?

 3          A.   Yes.

 4          Q.   What documents have you read or consulted

 5    in preparation for your testimony on this topic?

 6          A.   The discovery information and answers to

 7    various motions.

 8          Q.   What persons have you talked to in order

 9    to prepare for your testimony on this topic?

10          A.   My attorney.

11                MR. ONSTOTT:

12                     Real quick point of clarity.  Was

13                  that last damage to door, did you want

14                  to put that in as Exhibit M?

15                MS. PHELPS:

16                     Yes.

17    BY MS. PHELPS:

18          Q.   You testified about that you confronted

19    Russ Ivy on the property with a broom and picked up

20    a satellite dish.  Are these all actions that you

21    took on behalf of XL REI?

22          A.   No.  I was having -- they are not.  I was

23    having manic episodes, so I don't think I was even

24    in control mentally.  (Inaudible)  They were not on

25    behalf of XL REI.

```
 1                    tenant.
 2   BY MS. PHELPS:
 3        Q.   You knew Russ Ivy was still on the
 4   property, because you heard him on the call with
 5   the police, correct?
 6            MR. ONSTOTT:
 7                Object to form.  You can answer.
 8            THE WITNESS:
 9                At the time we had the call with the
10            police, yes, but not afterwards.
11   BY MS. PHELPS:
12        Q.   As an employee of XL REI, was your intent
13   to go to the property to confront Russ Ivy and get
14   him to leave voluntarily?
15        A.   No.   That was not my intent.
16        Q.   What was your intent?
17        A.   To clean and fumigate the property.
18        Q.   Why do you believe you had a right to
19   clean the property for a new tenant when you did
20   not have a court order to remove Russ Ivy from the
21   property?
22            MR. ONSTOTT:
23                Object to form.  You can answer.
24            THE WITNESS:
25                Because Russ Ivy had not paid the
```

```
 1              rent for three months, and he received
 2              notice to vacate.
 3    BY MS. PHELPS:
 4         Q.   Is it XL REI's position that you can
 5    remove a tenant from the property forcibly without
 6    a court order?
 7         A.   I'm sorry.  What was the question again?
 8         Q.   Is it XL REI's practice to remove tenants
 9    from properties without court orders?
10         A.   XL REI does not have that practice.
11         Q.   Does XL REI engage in self-help
12    evictions?
13         A.   No.
14         Q.   You confronted Russ Ivy at the property
15    on behalf of XL REI, correct?
16              MR. ONSTOTT:
17                 Object to form.  You can answer.
18              THE WITNESS:
19                 Like I said, leading up to that day,
20              when I arrived at the property, I was
21              probably having a mental episode, so I
22              would say I was not acting on behalf of
23              XL REI during that time.
24    BY MS. PHELPS:
25         Q.   Was Tim with you at that time?
```

```
 1            THE WITNESS:
 2                 I don't believe so.
 3   BY MS. PHELPS:
 4       Q.   Why don't you believe so?
 5       A.   I don't believe that Officer Hickson said
 6   that to me.
 7       Q.   On the call, Russ Ivy mentions that you
 8   were slamming the broom like a bat into the
 9   exterior of the property.  Is it possible you were
10   doing that?
11            MR. ONSTOTT:
12                 Object to form.  You can answer.
13            THE WITNESS:
14                 I don't recall.
15   BY MS. PHELPS:
16       Q.   Could you hear the sound of objects
17   slamming against the exterior of the property on
18   the 911 call?
19            MR. ONSTOTT:
20                 Objection to form.  You can answer.
21            THE WITNESS:
22                 Yes.
23   BY MS. PHELPS:
24       Q.   From the call, Russ Ivy says he thinks
25   that the person doing the damage might be his
```

1   landlord.  Do you believe that he is identifying

2   you?

3           MR. ONSTOTT:

4               Objection to form.  You can answer.

5           THE WITNESS:

6               I believe so.

7   BY MS. PHELPS:

8       Q.   At the end of the call, Russ Ivy mentions

9   that you got into a black Expedition.  Was this car

10  driven by Tim Spelt?

11      A.   Yes.

12          MR. ONSTOTT:

13              Objection to form.

14  BY MS. PHELPS:

15      Q.   What is XL REI's official position on the

16  events that occurred the day of that 911 call?

17      A.   XL REI's official position is I was

18  undergoing a manic episode, and I was not in full

19  control of my actions that day.

20      Q.   Does XL REI deny that you were on the

21  property as part of your job responsibilities?

22      A.   I'm not sure I understand.

23      Q.   I'll rephrase. It is, however, XL REI's

24  position that you went to Louisiana and were on the

25  property as part of your job responsibility?

1           letting you do it, but if we are going

2           to do this for another half an hour,

3           I'm going to terminate it, because we

4           have a lot to get through, and this is

5           not what you told me your role here

6           was.

7       MR. MOST:

8           Okay.  This won't take a half hour.

9       I think it's going to be fairly short.

10      MR. ONSTOTT:

11          If you can get through it quickly,

12      let's get through it and move on. Thank

13      you.

14  BY MR. MOST:

15      Q.   Ms. Tran, do you have a memory of when

16  you picked up the broom and the satellite dish at

17  the Dock Marinoff property?

18      A.   I did it in defense.

19      Q.   But you remember when you did that,

20  correct?

21          MR. ONSTOTT:

22          Object to the form, but you can

23          answer.

24          THE WITNESS:

25          Vaguely.

1                    C E R T I F I C A T E

2

3              This certification is valid only for
a transcript accompanied by my original signature
4   and original required seal on this page.

5              I, SANDRA P. DIFEBBO, Certified
Court Reporter, in and for the State of Louisiana,
6   as the officer before whom this testimony was
taken, do hereby certify that JADE TRAN, after
7   having been duly sworn by me upon authority of R.S.
37:2554, did testify as hereinbefore set forth in
8   the foregoing 190 pages;

9              That the testimony was reported by
me in stenotype, was prepared and transcribed by me
10  or under my personal direction and supervision, and
is a true and correct transcript to the best of my
11  ability and understanding;

12             That the transcript has been
prepared in compliance with transcript format
13  guidelines required by statute or by rules of the
board, that I have acted in compliance with the
14  prohibition on contractual relationships as defined
by Louisiana Code of Civil Procedure Article 1434
15  and in rules and advisory opinions of the board;

16             That I am not related to Counsel or
to the parties herein, nor am I otherwise
17  interested in the outcome of this matter.

18

19

20

21  _____
Sandra P. DiFebbo,
22  Certified Shorthand Reporter

23  Date:  _____

24

25